IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. |
| v. | 1:21-CR-409-TWT-CMS |
| ANTONIO PENALOZA TORRES RITO ARMANDO TORRES GUTIERREZ, | |
| Defendants. | |

## FINAL REPORT AND RECOMMENDATION

Before the Court are two pending motions to suppress: one filed by Rito Armando Torres Gutierrez ("Gutierrez") [Doc. 29], and one filed by Antonio Penaloza Torres ("Torres") [Doc. 66].

Defendant Gutierrez has moved to suppress two categories of evidence. First, he complains that evidence obtained during an investigatory detention following a September 30, 2021 traffic stop of a Nissan Frontier truck that he was driving should be suppressed because the detention lasted more than six hours and was otherwise unreasonable. Second, he seeks to suppress evidence seized later that evening pursuant to a federal search warrant for a residence in Ellenwood, Georgia. [Doc. 29]. Defendant Torres, who was Gutierrez's passenger in the Frontier when it was stopped—and who law enforcement also detained for more than six hours without

probable cause—adopted Gutierrez's motion insofar as it challenges the lengthy investigatory detention.  [Doc. 33].

On September 20, 2022, I held an evidentiary hearing during which the Government called three witnesses: Georgia State Patrol ("GSP") Trooper First Class Brian Harman, GSP Trooper First Class Barrett Smith, and DEA Task Force Officer Caleb Poole.  [Doc. 48, Transcript ("Tr.")].  The defense presented no evidence, although Gutierrez provided a written sworn statement in support of his contention that he has standing to challenge the search warrant.  [Doc. 56-1].

For the reasons stated below, I will recommend that both motions be granted with respect to evidence obtained during the prolonged investigatory detention and that Gutierrez's motion be denied for lack of standing to the extent it challenges the search warrant.

## I.    Factual Background

Task Force Officer Caleb Poole testified that in September 2021, he was working on an investigation in which the DEA used a confidential source to order methamphetamine from a broker.  [Tr. at 131, 189].  The broker would set a time and location for the deal, and the agents would send an undercover agent to pose as the buyer.  [Tr. at 131].  The agents would then meet a courier at the designated time and place, and they would engage in a hand-to-hand drug transaction.  [*Id.*].

**The September 30th Controlled Buy**

Officer Poole testified that on September 30, 2021, as part of this investigation, the broker proposed a drug transaction to take place at a pharmacy in Ellenwood, Georgia.  The agents set up surveillance at the pharmacy.  [Tr. at 131–32].  Shortly after noon on that day, an individual who was previously unknown to law enforcement arrived at the pharmacy driving a blue Volkswagen Jetta.  [Tr. at 133, 167].  The individual exited the Jetta and handed the undercover officer a T-Mobile bag containing one kilogram of methamphetamine.  In return, the undercover officer passed him approximately $4,500 in U.S. currency.  [Tr. at 133; Gov. Ex. 7 (Doc. 49-6) at 7 ¶ 16].  This transaction was captured in strikingly clear photographs, which the Government introduced into evidence at the hearing.  [Gov. Ex. 5 (Doc. 49-3 at 1, photo of the suspect standing next to the Jetta); Gov. Exs. 6, 7 (Docs. 49-3 at 2–3, photos of the suspect placing the T-Mobile bag inside the undercover officer's vehicle); Gov. Ex. 8 (Doc. 49-3 at 4, photo of the undercover officer handing the suspect U.S. currency); Gov. Ex. 9 (Doc. 49-3 at 5, photo of the drugs that were contained in the T-Mobile bag)].

The individual then left the scene driving the Jetta, and the agents followed him to a residence located at 195 Lakeside Drive in Ellenwood, Georgia ("the Lakeside Drive Residence").  [Tr. at 136–37].  Unlike the other houses in the

neighborhood, the Lakeside Drive Residence looked suspicious because it did not appear to be lived in, it had no personal effects outside, all the front windows were covered, and it had burglar bars on the front door. [Tr. at 140]. The Jetta pulled into the garage of the Lakeside Drive Residence. [Tr. at 143–44]. The agents then set up surveillance outside. [Tr. at 139].

### GSP Involvement in the Investigation

GSP Troopers Brian Harman and Barrett Smith testified that on September 30, 2021, Officer Poole advised them that the DEA was going to do a controlled purchase of a kilogram of methamphetamine and asked for GSP assistance to possibly make a traffic stop at the conclusion of the deal. [Tr. at 49, 85]. Later that afternoon, Officer Poole told the troopers that the anticipated controlled buy had occurred, that a DEA undercover agent had purchased one kilogram of methamphetamine from a suspect driving a blue Volkswagen Jetta, and that the agents had followed the Jetta away from the deal location to the Lakeside Drive Residence. [Tr. at 16, 50–51, 85, 87, 124]. After receiving that information, the troopers stood by, waiting to assist. During this time, they were in contact with the DEA agents and officers through both text (via WhatsApp) and voice communications (via a push-to-talk radio and an in-car radio). [Tr. at 16–17, 19, 86, 124, 132–33]. The Government introduced a transcript of the WhatsApp Chat that

was occurring among the various law enforcement officers during this time.  [Gov.
Ex. 10 (Doc. 49-4)].

### The Two Traffic Stops—the Frontier & the Jetta

A few hours later, two Hispanic males (later identified as Defendant Gutierrez
and Defendant Torres) exited the garage door of the Lakeside Drive Residence and
got into a blue Nissan Frontier truck that was parked in front of the house, and they
drove off.  [Tr. at 141–42, 169].  At that point, the agents asked the GSP troopers to
conduct a traffic stop on the Frontier.  [Tr. at 16, 144].  Officer Poole testified that
neither the men nor the Frontier were previously known to law enforcement; the only
reason they were suspicious was that the men left the Lakeside Drive Residence after
the Jetta had returned there following the controlled buy.  [Tr. at 170, 187].  Officer
Poole left to follow the Frontier, but other agents remained behind to continue
surveillance on the Lakeside Drive Residence and to wait for the Jetta (which was
still in the garage at the time) to leave.  [Tr. at 145, 147–48].

Trooper Harman took the lead in conducting the traffic stop of the Frontier.
He ran the license plate and learned that the vehicle was registered to Gutierrez, but
he noted that there was no corresponding driver's license for Gutierrez in the system.
[Tr. at 13, 52].  This caused Trooper Harman to suspect that the Frontier was being
driven by an individual (its registered owner, Gutierrez) who did not have a valid

driver's license.   [Tr. at 13–15].   At approximately 2:33 p.m., Trooper Harman performed a traffic stop on the Frontier based on that suspicion.  [Tr. at 19-20, 50; Gov. Ex. 1 (Doc. 49-1)].

Trooper Harman testified that upon stopping the Frontier, his suspicions were confirmed; Gutierrez was indeed driving without a valid driver's license.  [Tr. at 25–26, 50].  The passenger was Defendant Torres, who also did not have a valid driver's license.  [Tr. at 25–26].  Trooper Harman testified that when discussing the men's IDs, he noticed that they each had a large amount of cash in their wallets–approximately $2,000 between the two of them.  [Tr. at 37–38, 40–41].  He clarified, however, that in his job he sees cash in wallets all the time, and he did not find the amounts that Gutierrez and Torres had in their wallets to be suspicious.  [Tr. at 37, 73, 148–49].

Trooper Harman testified that there was a strong gas smell around the Frontier.  [Tr. at 27].  Gutierrez told him that they were on their way to the mechanic to have the gas problem repaired.  [Tr. at 27–28].  Torres confirmed that he and Gutierrez were heading to see a mechanic.  [Tr. at 30].

Trooper Harman advised the men that neither of them could lawfully drive the Frontier because neither had a driver's license.  [Tr. at 27–28].  Gutierrez stated that he could have someone with a valid driver's license come pick them up and

retrieve the Frontier.  [*Id.*].  Trooper Harman asked Gutierrez to wait before calling

for a ride because Officer Poole wanted to interview him.  [Tr. at 28].

Shortly after Trooper Harman pulled the Frontier over, Trooper Smith arrived

on the scene of the Frontier stop, but he did not stay for long.  [Tr. at 27, 89].  Within

minutes of his arrival, agents observed the Jetta leave the Lakeside Drive Residence,

and they asked Trooper Smith to conduct a traffic stop of the Jetta.  [Tr. at 145–46].

Upon receiving this notification, Trooper Smith left the scene of the Frontier stop

and positioned himself to be ready to stop the Jetta.  [Tr. at 30–31, 108, 146].

Meanwhile, Trooper Harman asked Gutierrez for permission to search the

Frontier, and Gutierrez told him yes.  [Tr. at 31–32].  Gutierrez and Torres exited

the Frontier, and Trooper Harman searched it.  [Tr. at 32].  Officer Poole was present

and assisted with the search.  [Tr. at 33, 148].  Trooper Harman located some open

containers of alcohol in the back seat area and a large amount of trash in the bed of

the truck.  [Tr. at 32].  In the trash, he found an old Ziploc bag.  [Tr. at 33].  He field-

tested the bag for drugs, but the test came back negative.  [*Id.*].  Ultimately, the

search of the Frontier revealed no drugs, but the officers found multiple cellphones

and wire-transfer receipts that Officer Poole considered to be relevant to the

investigation. [Tr. at 148–49].

Approximately sixteen minutes into the Frontier stop, Trooper Harman determined that there was no basis to hold Gutierrez and Torres, and he decided that it was time for them to conclude the traffic stop because all that was left to do was write the ticket and allow Gutierrez to call his ride.  [Tr. at 34].  Officer Poole, however, instructed Trooper Harman to "just hold tight to make sure that everything was okay with that other traffic stop [of the blue Jetta]."  [*Id.*].

A few blocks away, Trooper Smith conducted a traffic stop of the Jetta for an illegal window tint and failure to maintain the proper lane.  [Tr. at 84, 108, 118, 145–46].  Defendant Jaime Cruz Duarte ("Duarte") was driving the Jetta and admitted that he did not have a valid driver's license.  [Tr. at 92, 118, 155].  Trooper Smith recognized Duarte as the individual who had conducted the controlled purchase earlier that day based on a photograph contained in the WhatsApp text chain.  [Tr. at 119, 122–23].  Duarte provided an identification document and, using a translation application on the trooper's phone, he stated that the Jetta belonged to a friend who had left for Mexico two days earlier.  [Tr. at 93–94].  Duarte stated that he was coming from "Roswell Creek," which was not consistent with Trooper Smith's information that Duarte had just come from the Lakeside Drive Residence.  [Tr. at 96].  Trooper Smith deployed his canine partner, Hans, who provided a positive indication at the front driver's side door of the Jetta.  [Tr. at 101–02].  Based on the

positive indication, Trooper Smith conducted a search of the Jetta, and he located a blue Adidas bag under the front driver's seat containing approximately $21,200 in cash that was separated into four large bundles using plastic bands. [Tr. at 103–04; Gov. Ex. 4 at 4; Gov. Ex. 13 (Doc. 49-6) at 8 ¶ 21]. Duarte denied that the money belonged to him. [Tr. at 104–05]. A GCIC search confirmed that Duarte did not have a valid driver's license, and Trooper Smith placed Duarte under arrest. [Tr. at 105, 156–57].

Back at the Frontier stop, which was now into its twenty-sixth minute, Trooper Harman chatted with the men through an interpretation app on the phone, and he asked Gutierrez where he lived; Gutierrez answered "Morrow," and Torres stated that he lived with Gutierrez. [Tr. at 36–37]. Gutierrez also stated that he was coming from his residence, heading to the mechanic, but Trooper Harman knew this was not true because the Frontier had been observed leaving the Lakeside Drive Residence, which is in Ellenwood, not Morrow. [Tr. at 37]. Neither man gave a specific address of where he lived, which Trooper Harman thought was odd. [Tr. at 36–37, 70]. On cross-examination, however, Trooper Harman admitted that he had no reason to believe that the men were not telling the truth about where they were going or anything else. [*Id.* at 70].

Twenty-seven minutes into the Frontier stop, Trooper Harman again advised the agents that there was no basis to hold Gutierrez and Torres and stated that he was going to start the process of "cutting [them] loose." [Tr. at 38]. In response, someone from the DEA again stopped Trooper Harman from releasing the men, purportedly because the agents "had already talked with the AUSA" and intended to apply for a warrant for the Lakeside Drive Residence. [Tr. at 38–39]. Trooper Harman testified that at that point, Gutierrez and Torres were not free to leave, even though they had not formally been placed under arrest. [*Id.*].

Thirty-two minutes into the Frontier stop, someone from the DEA advised Trooper Harman that Gutierrez and Torres were going to be detained, that the agents were getting a search warrant, and that the agents were going to take Gutierrez and Torres "to another location while they finished up the search warrant." [Tr. at 39]. At that point, the agents seized the cash from both men as well as their cellphones. [Tr. at 148–49].

Fifty-one minutes into the Frontier stop, the DEA investigators transported Gutierrez and Torres to a park near the Lakeside Drive Residence; the men were transported in a law enforcement vehicle, and an investigator drove the Frontier. [Tr. at 41–43, 155]. Officer Poole testified that in his view, the men were not under arrest at the time that they were transported to the park; rather, they were only subject to

10

an investigatory detention.  [Tr. at 152–54].  On the other hand, Duarte—the driver of the Jetta—was considered to be under arrest.  He also was taken to the park along with Gutierrez and Torres.  [Tr. at 106, 156].

Officer Poole testified that the reason the agents relocated everyone to the park was that the agents wanted to detain the three men while they obtained a search warrant for the Lakeside Drive Residence and for logistical purposes, noting that it was not safe to remain on the side of the road.  [Tr. at 157].  When asked why agents did not release Gutierrez and Torres (who Officer Poole conceded were not under arrest at the time), Officer Poole testified that it might have been difficult to locate them later and that he had concerns they might either destroy evidence or communicate with someone who might destroy evidence.  [Tr. at 157–58].

### Events at the Park

Officer Poole testified that they stayed at the park for five or six hours while he drafted an affidavit in support of a search warrant for the Lakeside Drive Residence, a process he described as "quite . . . time-consuming."  [Tr. at 159, 193].  While Officer Poole was working on the affidavit, the detainees sat on the curb, and the agents provided them with pizza and water.  [Tr. at 193].

Meanwhile, the law enforcement officers continued their investigation.  They combined the money from the two stops—the banded $21,200 seized from the Jetta

and the smaller sums seized from the wallets of Gutierrez and Torres—into a single bag and asked the GSP troopers to conduct a K-9 sniff on the bag. [Tr. at 64–65, 158–59]. At around 5 p.m. (two and a half hours after the Frontier was stopped), Trooper Harman's canine partner, Bolt, conducted a sniff of a bag, and Bolt gave a positive indication. [Tr. at 43, 45–46, 64–65, 76, 158–59]. Apparently, the warrant affidavit was not yet complete at this time because Officer Poole added the following statement to the search warrant affidavit he was working on:

> A short time after the traffic stops, Trooper Harmon utilized his K-9 partner to run an open-air sniff of the currency seized from the two traffic stops mentioned above. Trooper Harmon stated that his K-9 partner gave an individual positive alert to each amount of currency seized form (sic) DUARTE, Antonio Torres and Rito Torres [Gutierrez].

[Gov. Ex. 13 at 9 ¶ 22]. During the evidentiary hearing, Officer Poole admitted that this statement in his affidavit was not correct in two significant respects. [Tr. at 162]. First, Officer Poole acknowledged that the money from Gutierrez and Torres was comingled with the money from the Jetta so there was not, in fact, "an individual positive alert to each amount of currency" seized from each man. [*Id.*]. Second, Officer Poole admitted that his affidavit incorrectly stated that the K-9 deployment occurred "a short time after the traffic stops," when in reality it occurred hours later at a different location. [Tr. at 161–62].

Seeking to add even more facts to their search warrant affidavit, the DEA agents instructed the troopers to perform a K-9 deployment on the Frontier, even though the Frontier had already been thoroughly searched on the side of the road and no contraband had been found.  [Tr. at 172–73].  Around 5:30 p.m. (three hours after the Frontier was stopped), Bolt conducted a sniff of the Frontier, and he "showed alert behavior by attempting to climb under the truck and sticking his nose under the bed."  [Tr. at 173; Def.'s Ex. 1 (Doc. 50-1)].  At the hearing, Trooper Harman testified that Bolt's alert was merely a change in behavior, rather than a positive indication.  [Tr. at 43, 65–66, 120–21].  Nevertheless, Officer Poole decided to include facts about this K-9 sniff in his affidavit, stating in Paragraph 19 that "the dog alerted to the presence of narcotics" and implying that narcotics were located in the Frontier.  [Gov. Ex. 13 at 8 ¶ 19].  Officer Poole failed to mention in his search warrant affidavit that law enforcement had conducted an earlier consent search of the Frontier that revealed no drugs or other contraband.  [*Id.*].[1]

---

[1] Paragraph 19 of the affidavit contains Officer Poole's recap of what happened during the stop of the Frontier, and it includes the subsequent K-9 sniff of the Frontier.  [Gov. Ex. 13 at 8 ¶ 19].  The contents of this paragraph are problematic in several respects.  First, Officer Poole's statement implies that the sniff occurred at the same time as the traffic stop, rather than three hours later.  Officer Poole admitted on the stand that this was an error.  [Tr. at 161].  Second, Officer Poole failed to mention in his affidavit that he conducted a thorough consent search of the Frontier on the side of the road and located no drugs or contraband.  Third, this

At 8:25 p.m. (approximately six hours after the traffic stops), United States Magistrate Judge Alan Baverman signed a search warrant for the Lakeside Drive Residence. [Tr. at 165; Gov. Ex. 14 (Doc. 49-7)]. At approximately 8:30 p.m., the agents executed the warrant at the Lakeside Drive Residence, and the search took "quite some time," approximately twelve hours. [Tr. at 194; Doc. 78 at 3]. According to Officer Poole, the house appeared to be a working methamphetamine lab and a stash house. Inside, the officers located a large amount of methamphetamine, crystal methamphetamine, and powder methamphetamine, an active methamphetamine conversion lab, and a firearm. [Tr. at 166].

It is the Government's position that Gutierrez and Torres were placed under arrest around the time that the search began, at approximately 8:30 p.m. [Doc. 78 at 3]. Officer Poole testified that Duarte, Gutierrez, and Torres were transported to the detention facility before midnight. [Tr. at 195].

---

statement does not distinguish between Bolt's "change in behavior" and an "indication," information provided by Trooper Harman at the evidentiary hearing. [Tr. at 43, 65–66, 120–21]. Fourth, Officer Poole states that the cash was found in the men's pockets, rather than in their wallets. [Gov. Ex. 13 at 8 ¶ 19]. Finally, Officer Poole avers that the Frontier was stopped for a window-tint violation and failure to maintain lane [*id.*], but at the hearing, he admitted that this was wrong as well; Trooper Harman stopped the Frontier based on his suspicion that it was being driven by a person without a valid driver's license [Tr. at 163].

On October 1, 2021, Duarte, Gutierrez, and Torres were charged in federal criminal complaints with conspiracy to possess with intent to distribute methamphetamine. [Doc. 1]. On October 19, 2021, a federal grand jury returned an indictment against them for conspiracy to possess with intent to distribute methamphetamine, possession with intent to distribute methamphetamine, and possession of a firearm in furtherance of a drug trafficking crime. [Doc. 10].

Duarte's case was certified ready for trial last month [Doc. 73], and the only remaining pretrial motions are the two motions to suppress filed by Gutierrez and Torres, hereinafter, "Defendants." [Docs. 29, 66].

## II.    The Investigatory Detention

For purposes of their motions to suppress, Defendants do not challenge the legality of the 2:30 p.m. traffic stop of the Frontier.[2] Rather, they contend that once

---

[2] Gutierrez initially argued that the traffic stop of the Frontier violated the Fourth Amendment, and Torres adopted that argument. [Doc. 29 at 4 ¶ 11 (Gutierrez stating, "[t]he traffic-stop [sic] of the Nissan Frontier . . . violated the Fourth Amendment."); Doc. 33 at 1 ¶ 2 (Torres adopting Gutierrez's arguments concerning "such issues as . . . the basis for the traffic stop")]. In their post-hearing briefs, however, Defendants abandoned that argument, electing instead to focus on the legality of the six-hour investigatory detention. [Doc. 56 at 8 (Gutierrez stating that he would assume for the sake of argument that law enforcement possessed "articulable suspicion to justify a brief investigative detention"); Doc. 59 (Torres adopting Gutierrez's post-hearing brief)].

they were transported to the park, the traffic stop matured into an unlawful arrest. [Doc. 56 at 4–9]. The Government, on the other hand, contends that Defendants were merely the subject of a lawful *Terry* stop between 2:30 p.m. (when they were stopped) and approximately 8:30 p.m. (when the warrant was executed and the drugs were found in the Lakeside Drive Residence). [Doc. 78 at 5]. According to the Government, the lengthy pre-arrest detention was lawful because the officers had probable cause to search the Lakeside Drive Residence and feared that releasing Defendants could result in the destruction of evidence. [Doc. 62 at 14].

Under *Terry v. Ohio*, officers may conduct an investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity. 392 U.S. 1, 21 (1968). An arrest, on the other hand, must be supported by probable cause. *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007). When determining whether a *Terry* stop has matured into an arrest, courts consider four factors: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursue the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004). I will evaluate each of these factors in turn.

The first factor focuses on the law enforcement purpose served by the detention. The Eleventh Circuit has held that appropriate purposes for brief *Terry* detentions are those that are "likely to confirm or dispel their suspicions quickly" and that the detentions should be minimally intrusive. *See United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988). Here, the officers employed several techniques during the investigative detention. First, when they were on the side of the road, Trooper Harman spoke with Defendants, asking questions about their identity, where they lived, and where they were going. [Tr. at 25–28, 36–37]. Next, he obtained consent to search the Frontier, and he then promptly searched the truck. [Tr. at 31–33]. But when those techniques failed to yield probable cause to arrest Defendants, the officers decided to employ another technique—move the suspects to a new location where they could conduct additional K-9 sniffs and detain the suspects for hours while they obtained a federal warrant to search the Lakeside Drive Residence. [Tr. at 39, 41–43, 155, 157, 159, 173, 193].

The first two of these techniques—asking questions about Defendants' identities and travel plans and conducting a consent search—are appropriate, minimally intrusive investigative techniques for a *Terry* investigation. *Hardy*, 855 F.2d at 759 (explaining that noncustodial questioning of a detained person is an example of a brief and nonintrusive investigation technique); *United States v.*

*Mendez-Bernal*, No. 3:19-cr-10-TCB-RGV, 2020 WL 6495109, at *10 (N.D. Ga. July 22, 2020) (finding that a trooper's diligence in completing a consent search to confirm or dispel his reasonable suspicion of illegal activity was a valid purpose under *Terry*), *adopted by* 2020 WL 5494728 (N.D. Ga. Sept. 11, 2020).

But moving a defendant to a new location for the purpose of restraining him for hours while an affidavit is written and additional evidence is amassed is not an appropriate technique for a *Terry* investigation. *See Hardy*, 855 F.2d at 759. These actions are a far cry from the types of approved purposes that are minimally intrusive and likely to confirm or dispel suspicions quickly. Here, Trooper Harman testified that the purpose of the Frontier stop had been accomplished within sixteen minutes, at which point he believed Defendants should be allowed to leave. [Tr. at 34]. Yet the officers elected to transport Defendants to a different location and detain them outdoors for hours—actions that involved maximum intrusiveness—while knowing that the federal search warrant process was lengthy. [Tr. at 39, 41–43, 155, 157, 159, 173, 192]. I conclude that the first factor weighs in favor of finding the detention unreasonable.

The second factor—whether the officers pursued their investigation with diligence—is either neutral or weighs against the Government. The Government argues that the process of obtaining a warrant is lengthy, pointing to Officer Poole's

testimony that the process is "quite . , , time-consuming" and that it took him several hours to finalize the affidavit.  [Doc. 62 at 12; Tr. at 159].  Although Officer Poole testified that he was working on the affidavit from the time that Defendants arrived at the park until approximately 7:30 p.m., this assertion is belied by the document itself.  [Tr. at 159–64, 193].  The probable cause portion of the affidavit in support of the warrant is fairly short—only four pages in length—and is riddled with errors.  [Gov. Ex. 13 at 6–9].  Thus, it is not clear why it took so long to draft the affidavit.  Moreover, the evidence shows that the agents were not merely maintaining the status quo to protect the evidence they expected to find in the Lakeside Drive Residence, but rather were actively working to beef up the affidavit by conducting additional K-9 deployments hours after the Frontier stop.  [Tr. at 43, 45–46, 64–65, 158–59, 172–73].  The Government has not provided sufficient evidence to show that the agents were working diligently during the entire six hours of Defendants' detention.  At best, this factor is neutral.

The third factor—the scope and intrusiveness of the detention—weighs heavily in favor of concluding that the investigatory detention matured into an arrest.  In *Virden*, the Eleventh Circuit addressed a similar situation where law enforcement moved a suspect and his vehicle to a new location for the purposes of conducting a canine sniff.  488 F.3d at 1320.  The court held that even though the whole encounter

lasted only thirty minutes, it amounted to a seizure that exceeded the boundaries of

a *Terry* stop due to its scope and intrusiveness:

> The seizure here was unreasonable absent probable cause because of its
> scope and intrusiveness.  While not unduly lengthy, the seizure was
> accomplished by the taking of Virden's vehicle to a new location for
> the purposes of investigation.  We have frowned upon the movement of
> individuals for such purposes.  Furthermore, to effectuate this seizure
> the officers handcuffed Virden, and without formally arresting him,
> drove him to another location.  Such a seizure exceeds the boundaries
> of a Terry stop.

*Virden*, 488 F.3d at 1321 (internal citations omitted).  Defendants argue that their

situation is similar to *Virden* in that they were seized, transported to the park so that

investigators could obtain additional evidence, and were not allowed to leave, all

without probable cause for an arrest.  [Doc. 56 at 6–7].

In response, the Government relies on *Illinois v. McArthur*, 531 U.S. 326

(2001) ("*McArthur*"), a case in which the Supreme Court held that it was appropriate

for law enforcement to prevent a man from entering his home for two hours while

the officers obtained a search warrant.   [Doc. 62 at 13–15].   *McArthur* is

distinguishable from the instant case in several respects.  First, the scope of the

detention in *McArthur* was limited.  *McArthur*, 531 U.S. at 329.  The defendant was

simply prohibited from entering his home in order to maintain the status quo while

a warrant was obtained.  *Id.*  Here, on the other hand, Defendants were physically

transported to a new location and thereafter detained outdoors, on the curb, at a park

to which they had no connection. [Tr. at 41–43, 152–54, 157–58, 193]. Second, the duration of the detention in *McArthur* was only two hours, whereas here it was three times that length. *See McArthur*, 531 U.S. at 329; *see also* [Tr. at 193]. Finally, in *McArthur*, law enforcement did not need to obtain additional facts to establish probable cause to get a warrant for the premises because they knew they had probable cause the entire time. *McArthur*, 531 U.S. at 329. Here, it appears that law enforcement believed that they needed additional facts to obtain the search warrant for the Lakeside Drive Residence because they spent some of the time at the park conducting K-9 sniffs and adding facts about those K-9 deployments to the search warrant affidavit. [Tr. at 43, 45–46, 64–65, 158–59, 172–73]. I conclude that the third factor weighs in favor of finding the detention unreasonable because both the scope and intrusiveness of the detention were extreme. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) (holding that "the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes").

Finally, the fourth factor—the length of the detention—also weighs heavily in favor of finding that the detention was unreasonable and that Defendants were under arrest at the time they were transported to the park. Although the Supreme

Court has declined to impose a rigid rule concerning the duration of an investigatory detention, *see United States v. Place,* 462 U.S. 696, 709–10 (1983), caselaw suggests that investigatory detentions should be brief. *Id.* at 710 (ninety-minute investigatory detention is probably too long); *United States v. Codd*, 956 F.2d 1109, 1111 (11th Cir. 1992) (two and a half hour investigatory detention was unreasonable); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984) (two hour and twenty minute investigatory detention was unreasonable); *see also United States v. Borys*, 766 F.2d 304, 313 (7th Cir. 1885) (seventy-five minute investigatory detention is at the "outer bounds of the Constitution"); MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE § 110.2(1) (AM. L. INST. 1975) (recommending twenty minutes as maximum duration for an investigatory detention).  Here, the consent search of the Frontier was completed approximately sixteen minutes into the stop, yet Defendants were detained for six hours—so long that day turned to night, and the officers had to provide Defendants with a meal.  [Tr. at 172–73, 193].  The Government has cited to no case in which any court has approved such a lengthy detention without probable cause.  I conclude that the fourth factor weighs in favor of finding the detention evolved into an unlawful arrest.

Weighing the four factors together and considering the totality of the circumstances, I conclude that the law enforcement officers' pre-arrest detention of

23

Defendants violated their Fourth Amendment rights and that evidence obtained as a result of the unlawful detention should be suppressed.  While I am mindful that the Court "should not indulge in unrealistic second-guessing" of law enforcement decisions, *see United States v. Sharpe*, 470 U.S. 675, 686 (1985), the facts presented in this case compel this result.

At my request, the parties have provided their positions as to what specific evidence would be subject to suppression if the Court were to grant Defendants' motions on this point.  [Doc. 77].  Both sides agree that the K-9 deployments that occurred at the park (one on the Frontier and one on the bag of combined money) would be subject to suppression if the Court were to grant Defendants' motions on this issue.  [*Id.* at 3–4].  Defendants, however, also want to suppress all evidence recovered from the Lakeside Drive Residence because facts about the K-9 alerts were included in the affidavit for the search warrant that resulted in the discovery of that evidence.  [*Id.* at 4].  The Government argues, and I agree, as discussed below, that Defendants lack standing to challenge the search of the Lakeside Drive Residence.  Thus, I will recommend that the only evidence to be suppressed is the evidence regarding the two K-9 deployments that occurred at the park.

### III.   Challenge to the Search Warrant for the Lakeside Drive Residence

Gutierrez next argues that the affidavit in support of the search warrant for the Lakeside Drive Residence is filled with errors, is based on illegally obtained evidence, omits material facts, and otherwise does not contain sufficient facts to establish probable cause to support a search warrant.  He moves to suppress all evidence recovered at the residence.[3]  [Doc. 29 at 5–7; Doc. 56 at 9–13].  Gutierrez claims to have standing to challenge the warrant because (1) he had spent the previous night in the Lakeside Drive Residence; (2) there were three mattresses in one of the bedrooms—along with men's clothing, baseball caps, and shoes—and there was food in the kitchen; and (3) wire-transfer receipts with his name on them were located inside the residence during the search.  [Doc. 70 at 1–2].  The Government responds that Gutierrez has not established standing sufficient to assert

---

[3] Torres did not adopt Gutierrez's arguments about the search warrant.  [Doc. 33 ¶ 2 (identifying the issues raised in Gutierrez's motion that Torres was adopting and not mentioning any challenge to the search warrant)].  Although it is apparent that Torres would very much like to exclude the evidence located during the search of the Lakeside Drive Residence, Torres has provided no evidence or argument to show that he has standing to make such a challenge.  Moreover, during oral argument, I confirmed with his lawyer that Torres had made no effort to establish standing, and his counsel stated, "it continues to be my client's position that he has not resided in that home."  [Doc. 69, Oral Argument Transcript, at 4].

a violation of the Fourth Amendment with respect to the search of the Lakeside Drive Residence.  [Doc. 72 at 3–5].

The Fourth Amendment prohibits law enforcement from conducting "unreasonable searches and seizures."  U.S. CONST. amend. IV.  The Eleventh Circuit has set forth the following standard regarding when a defendant has standing to challenge a search:

> To have standing to challenge a search or seizure under the Fourth Amendment, one must manifest an objectively reasonable expectation of privacy in the invaded area.  The proponent of a motion to suppress has the burden to allege, and if the allegations are disputed, to prove, that his own Fourth Amendment rights were violated by the challenged search or seizure.  If the movant establishes an expectation of privacy in the premises searched and the items seized, then the burden of proof shifts to the government to establish that an exception to the search warrant requirement was applicable and that the search and seizure were reasonable.  The movant's standing to challenge a search or seizure is a threshold issue that the district court must address when ruling on a motion to suppress.

*United States v. Jackson*, 618 F. App'x 472, 474 (11th Cir. 2015) (per curiam) (internal citations and quotation marks omitted).

Here, Gutierrez provides the following affidavit testimony in support of his argument that he has standing to challenge the search of the Lakeside Drive Residence: "On the night of September 29, 2021, I stayed to sleep at the house located at 195 Lakeside Drive, Ellenwood, GA." [Doc. 56-1 at 1].  Noticeably absent from this affidavit is anything indicating that Gutierrez was the lawful owner or

lessee of the Lakeside Drive Residence or that he had permission to be there on September 29th.  In addition to this statement, Gutierrez points to items found by law enforcement when they searched the residence, such as three mattresses, men's clothing, baseball caps, shoes, and food.  [Doc. 70 at 2].  He also attempts to rely on wire-transfer receipts with his name on them that were seized during the search. [*Id.*].

I begin with the unremarkable proposition that Gutierrez's evidence about the mattresses, clothing, and food shows only that multiple people were living in the Lakeside Drive Residence—not that Gutierrez was one of them.  And his argument about the wire-transfer receipts fails because he has not provided any evidence as to how those receipts got there.  He has not, for example, claimed that he left the receipts at the Lakeside Drive Residence for safekeeping or even that he put them there himself.  The fact that his receipts were located at the Lakeside Drive Residence has no bearing on whether he had a legitimate expectation of privacy in the residence.

As for Gutierrez's statement that he spent the previous night in the Lakeside Drive Residence, this also is not sufficient to establish standing.  In the absence of evidence that Gutierrez was the lawful owner or lessee of the Lakeside Drive Residence, he would need to somehow show a "significant and current interest" in

the searched premises in order to establish an expectation of privacy. *See United States v. Bushay*, 859 F. Supp. 2d 1335, 1349–50 (N.D. Ga. 2012) (citing *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984)); *see also United States v. Son*, No. 1:12-cr-42-ODE-JFK, 2012 WL 4711978, at *8 (N.D. Ga. Oct. 2, 2012). Facts that might have helped Gutierrez make such a showing could have included: whether he had ever stayed in the Lakeside Drive Residence on any night other than September 29, 2021; whether he intended to ever stay in the residence again; whether any of his belongings were in the residence; his relationship, if any, to the owner or lessee of the residence; whether he had a key to the residence; whether anyone had ever given him permission to stay at the residence; whether he received mail at the residence; whether his Frontier was registered at the address for the residence; whether he paid rent for the house; and any other fact that might show that he actually believed that he had any privacy rights in the residence. Gutierrez could have included such facts in his affidavit, but he did not. Gutierrez has not even explained his relationship to the Lakeside Drive Residence, such as whether he was an occasional houseguest or a visitor, nor has he alleged that any of his belongings were in the residence. As such, I conclude that Gutierrez has not shown a significant or current interest in the Lakeside Drive Residence. *See United States v. Jones*, 184 F. App'x 943, 947–48 (11th Cir. 2006) (per curiam) (finding that a defendant, who

inconsistently claimed he lived at residence "from time to time" and stored personal effects there, had no subjective expectation of privacy in residence because he also denied living there and told officers he did not have authority to consent to its search); *United States v. Perry*, No. 8:09-cr-78-T-33EAJ, 2009 WL 1952778, at *7 (M.D. Fla. July 6, 2009) (defendant who occasionally "crashed" at the residence and stored a couch at the residence did not have reasonable expectation of privacy), *aff'd*, 379 F. App'x 888, 895 (11th Cir. 2010).

Finally, the Lakeside Drive Residence appears to have been a location used to manufacture illegal drugs.  The Government provided a DEA Report of Investigation dated October 5, 2021, describing the main floor of the Lakeside Drive Residence as "a large conversion lab with several large burners, 5 gallon drums of acetone, metal strainers, coolers, large pots and various plastic containers with methamphetamine residue." [Doc. 78-1 at 1].  The report stated that "[t]he basement of the residence was set up for processing the methamphetamine out of the solid material. There was a wood chipper, 3 washing machines, large burners, propane tanks, large metal pots, buckets and large plastic containers." [*Id.*].  Courts have held that overnight guests have no reasonable expectation of privacy in residences used primarily for purposes of drug trafficking.  *United States v. Bell*, 218 F. App'x 885, 895–96 (11th Cir. 2007) (citing *United States v. Cooper*, 203 F.3d 1279, 1285

n.3 (11th Cir. 2000)); *see also United States v. Vazquez-Velazquez*, Case No. 1:11-cr-212-TCB-GGB, 2012 WL 917845, at *4–5 (N.D. Ga. Feb. 23, 2012) (recognizing that a defendant staying at a residence used primarily for drug operations has no reasonable expectation of privacy at that residence), *adopted by* 2012 WL 912787 (N.D. Ga. Mar. 16, 2012).  Given the overwhelming evidence that the Lakeside Drive Residence was being used as a meth lab, Gutierrez's single statement that he spent one night there carries even less weight in the standing calculus.

In conclusion, Gutierrez has established only that he stayed overnight at the Lakeside Drive Residence on a single occasion.  He has not established that he had any other interest in the residence, that he was on the property with the permission or consent of the owner, that he had any intent to return or other connection to the occupants of the residence, or the nature of his reason for being there.  The evidence also shows that the Lakeside Drive Residence was used primarily for drug-trafficking purposes.  Accordingly, I conclude that Gutierrez has not met his burden of showing that he had a reasonable expectation of privacy in the Lakeside Drive Residence.  To the extent he seeks to suppress evidence seized pursuant to the search warrant of that residence, the motion should be denied.

**IV.    Conclusion**

For the reasons stated, I **RECOMMEND** that the two pending motions to suppress [Docs. 29, 66] be **GRANTED** to the extent that they seek to suppress evidence of the two K-9 deployments that occurred during the unlawful investigatory detention at the park, and that the motions be **DENIED** to the extent they seek any other relief. [4]

The cases against these final two remaining defendants—Gutierrez and Torres—are hereby **CERTIFIED** ready for trial.  There are no other pending matters before me as to any of the defendants.

**SO REPORTED AND RECOMMENDED** this 30th day of August, 2023.

CATHERINE M. SALINAS
United States Magistrate Judge

---

[4] If the district judge disagrees with my view on Gutierrez's lack of standing, the case can be referred back to me for a full analysis of the warrant issue.